UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                                             :

RICHARD L. SEWELL,
                      Plaintiff,            :          11 Civ. 4236 (ALC)

   -against-                   :          **OPINION AND ORDER**

LINCOLN LIFE & ANNUITY COMPANY    :
OF NEW YORK,
                                           :

                     Defendant.         :
----------------------------------------------------------------X

**ANDREW L. CARTER, United States District Judge:**

    Defendant Lincoln Life & Annuity Company ("Lincoln" or "Defendant") seeks summary judgment in its favor and against Richard Sewell ("Sewell" or "Plaintiff") to dismiss Plaintiff's complaint seeking reversal of the administrative decision to end his Total Disability payments he received from his employer's insurance policy. Defendant also alleges that the opposition and cross-motion should not even be considered because it was filed beyond the extended due date.[1] For the reasons set forth below, Defendant's motion for summary judgment (Dkt. No. 21) is denied and remanded for further administrative review. Plaintiff's cross-motion (Dkt. No. 32) is also denied.

BACKGROUND

I.  Procedural History

---

[1] In addition, prior to Plaintiff's filing of its cross-motion, on August 4, 2012, Defendant filed a "Suggestion of Non-Opposition to Summary Judgment" arguing that the Motion for Summary Judgment should be deemed unopposed.

On May 4, 2011, Sewell filed his complaint in New York Supreme Court (*See* Dkt. No. 1, Ex. 3-4). On June 22, 2011, Lincoln removed the case to this Court. (Dkt. No. 1). On December 8, 2011, Sewell filed an Amended Complaint alleging Lincoln's arbitrary and capricious review and denial of Sewell's long-term disability benefits. Lincoln filed its answer the following day.

On October 28, 2011, the Honorable Judge Laura Swain issued a pre-trial scheduling order, requiring, *inter alia*, that any dispositive motions be filed by June 29, 2012 (Dkt. No. 11). On June 29, 2012, Lincoln filed a motion for summary judgment. Sewell filed his "Cross-Motion for Summary Judgment" (Dkt. No. 32) and Memorandum of Law in opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 35) on August 7.

Although not set forth in Sewell's Amended Complaint, this court has jurisdiction under 28 U.S.C. § 1331, based on Sewell's claim pursuant to the Employee Retirement Income Security Program (ERISA), 29 U.S.C. §1001 *et seq*. (*See* Dkt. No. 13, Am. Compl. ¶¶ 60-62).

II.  Consideration of Sewell's Opposition Motion and Cross-Motion for Summary Judgment

As an initial procedural matter, in addition to substantive disagreements with Sewell's motion in opposition and cross-motion for summary judgment, Lincoln's reply brief (Dkt. No. 39) also argues that the cross-motion should not even be considered because it was filed beyond the extended due date. Sewell's cross-motion seeks a ruling that, if the Court finds that Lincoln's determination was arbitrary and capricious, re-review by Lincoln is unnecessary. Rather, the court should reverse the denial of benefits and determine the amount owing to Plaintiff (Dkt. No. 35, at 17).

On August 8, 2012, Magistrate Judge Fox granted Plaintiff's motion for an extension of time *after* time had already run on the other extension (Dkt. No. 36). Specifically, on July 13, 2012, following a telephone conference Judge Fox ordered plaintiff to "serve and file his response to the defendant's summary judgment motion" on or before August 3, 2012 (Dkt. No. 26). Plaintiff's counsel did not file an opposition on August 3. He did not request an extension until August 6, 2012 and did not file until August 7.[2] Plaintiff counsel's affidavit does not state a basis for his motion to extend the time but given that it was filed after the date of the last extension expired, it should be reviewed as a motion under Fed. R. Civ. P. 6(b)(1)(B) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time. . . on motion made after the time has expired if the party failed to act because of excusable neglect.")

None of the cases cited by Lincoln take into account the unique situation here, where the motion for extension of time was granted by a magistrate judge. Congress provided that a district court judge could designate a magistrate to "hear and determine" any pretrial matter pending before the court, except certain "dispositive" motions. 28 U.S.C. § 636(b)(1)(A). While a motion for summary judgment is dispositive, the underlying motion for extension of time to reply is not. Thus, it was proper for Magistrate Judge Fox to hear the motion.

On non-dispositive matters, the orders of magistrate judges are afforded "substantial deference." *McAllan v. Von Essen,* 517 F.Supp.2d 672, 678 (S.D.N.Y.2007). Indeed, when considering a magistrate judge's ruling on a non-dispositive matter, a district judge will modify

---

[2] Plaintiff's motion for extension of time portrays the delay as "one business day later than scheduled" because he attempted filing on August 6, but because of filing errors, it was not actually accepted for filing until August 7. (*See* Dkt. Nos. 20-23).

or set aside any portion of the magistrate's order found to be "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *U. S. v. Raddatz*, 447 U.S. 667, 673, 100 S.Ct. 2406, 2411 (1980); *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010); *Botta v. Barnhart*, 475 F. Supp. 2d 174, 185 (E.D.N.Y. 2007); Fed. R. Civ. P. Rule 72(a).

A finding is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Botta*, 475 F.Supp. 2d at 185 (citing *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *United States v. Isiofia,* 370 F.3d 226, 232 (2d Cir. 2004)). An order is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Catskill Dev., L.L.C. v. Park Place Entrn't Corp.*, 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (citation omitted).

To be sure, the Second Circuit sets a high bar for excusable neglect concluding that failure to follow the clear dictates of a court rule will generally not constitute such excusable neglect. *See Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003) (citing *Canfield v. Van Atta Buick/GMC Truck Inc.*, 127 F.3d 248, 250 (2d Cir. 1997)).

However, even in the wake of such decisions, courts still recognize that granting an extension under 6(b)(1) is a matter of discretion for the district court and a finding of excusable neglect is sometimes possible even where the movant is not entirely blameless. *See, e.g.*, *Hill v. Washburn*, No. 08–CV–6285–CJS, 2013 WL 142706, at *4 (W.D.N.Y. Jan. 11, 2013) (accepting motion papers three months after deadline where attorney had been hospitalized and "state-wide hiring freeze at the Attorney General's Office resulted in the departure of two assistant attorneys without replacement and the re-assignment of over 50 cases"); *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.*, 769 F. Supp. 2d 269, 281 (S.D.N.Y. 2011) (noting that instances of excusable neglect are "not limited strictly to omissions caused by circumstances

4

beyond the control of [the] movant") (citing *LoSacco v. City of Middletown,* 71 F.3d 88, 93 (2d

Cir. 1995)); *Green ex rel. Estate of Green v. Advanced Cardiovascular Imaging*, No. 07 Civ.

3141(JCF), 2009 WL 3154317, \*4 (S.D.N.Y. Sept. 30, 2009) ("While it is arguable that

[plaintiff's attorney] could have taken steps to better handle [plaintiff's] case, the circumstances

causing him to neglect it were not fully within his control and therefore favor a finding of

excusable neglect.")

On the one hand, the underestimation of time needed to fully brief an opposition to

Defendant's motion for summary judgment as "grossly overly optimistic" is hardly convincing

as an excusable reason for neglect. However, the motion also contends that each statement of

material fact required an examination of complex medical records (Dkt. No. 29, Moskovitz Decl.

¶ 8) and that Defendant had omitted certain medical records that should be a part of the

administrative record (Moskovitz Decl. ¶ 9), which then had to be isolate included as exhibits to

plaintiff's motion (Moskovitz Decl. ¶ 10). Based on these rationalizations and given the "interest

of justice" to hear "significant a motion" (Moskovitz Decl. ¶ 14), it was not clearly erroneous for

Judge Fox to grant the extension to file an opposition to Defendant's motion for summary

judgment. Nor was it contrary to law. Lincoln was not severely prejudiced by the delay. The

delay of three days did not have any impact on their ability to file their reply memorandum. In

fact, Lincoln requested and received additional time to reply: Lincoln had sixteen days to reply

rather than the seven days it was given under the original order. There were no pending trial

dates and the delay did not affect any pre-trial scheduling. Finally, it does not appear that

Plaintiff or his counsel acted in bad faith in filing the opposition days after the extension

expired. Thus, Judge Fox's decision to grant an extension to file the opposition motion to

summary judgment should not be disturbed.

5

Given that Sewell's cross-motion does not add much in the way of substantive argument from his opposition, we will also consider it.

III. Facts

A. Lehr's Long-Term Disability Policy

On March 26, 2006, Sewell started his employment at Lehr Construction Company ("Lehr") as a Project Executive. Lehr sponsored and maintained a program of employee benefits, including long-term disability insurance, for its employees ("Lehr plan"). (*See* Rule 56.1 Stmt ¶1).[3] Effective January 1, 2007, Lehr purchased a contract of group long-term disability insurance from Jefferson Pilot LifeAmerica Insurance Company, No. 999919985314 ("Policy"), which later merged with Lincoln. (*See* Rule 56.1 Stmt ¶ 2).

Lehr delegated discretionary authority to Lincoln to determine whether claimants are eligible for LTD plan benefits, to interpret plan terms and to find necessary facts as part of the claim determination process. (Rule 56.1 Stmt ¶¶ 9-13; AR0856 ("When making a benefit determination under the Policy, the Company has the discretionary authority to: determine the Insured Employee's eligibility for benefits; and interpret the terms and provisions of this Policy."); AR0064).

B. Policy Definitions

The Policy provides a Total Disability Monthly Benefit to Insured Employees who become Totally Disabled equal to 60% of their Basic Monthly Earnings minus other received benefits, such as social security. (Rule 56.1 Stmt ¶ 14). The Policy defines "Total Disability" or "Totally Disabled" in relevant part, as follows:

---

[3] All references to "Rule 56.1 Stmt" refer to Dkt. No. 38, which incorporates Plaintiff's responses to Lincoln's Statement of Material Facts.

6

> "During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her own occupation.
>
> . . .
>
> The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability."

(Rule 56.1 Stmt ¶ 18; AR0074) (emphasis in original).

Pursuant to the Policy, Regular Occupation" and "Own Occupation", used interchangeably, is

> "[T]he occupation, trade or profession:
>
> 1. in which the Insured Employee was employed with the Employer prior to Disability; and
> 2. which was his or her primary source of earned income prior to Disability.
>
> It includes any work in the same occupation for pay or profit; whether such work is with the Employer, with some other firm or on a self-employed basis. It includes the main duties of that occupation as performed in the national workforce; not as performed for a certain firm or at a certain work site."

(Rule 56.1 Stmt ¶ 17; AR0062).

Pursuant to the Policy, "Main Duties" are those "job duties which (1) are normally required to perform the Insured Person's regular occupation; and (2) cannot reasonably be modified or omitted. Main Duties are determined as performed in the national workforce; **not** as performed at Lehr." (Rule 56.1 Stmt ¶ 16) (emphasis in original).

C.  Plaintiff's Illness and Initial Claim for Benefits

In 2006, Plaintiff was diagnosed with colon cancer. (Rule 56.1 Stmt ¶ 28; AR0777). Plaintiff had part of his colon removed to stem the cancer in December 2006. The procedure—a right hemicolectomy—involved removing the right side of the colon and attaching the small intestine to the remaining portion of the colon. (*See* Rule 56.1 Stmt ¶ 29; AR0777).  In October

7

2007, Plaintiff underwent two more surgeries, after which he suffered a complication known as wound dehiscience, where a wound ruptures along surgical suture. (AR0777). On or about March 12, 2008, Plaintiff submitted a claim to Lincoln for long-term disability benefits. (AR0796-97).

In his claim, Plaintiff identified unpredictable and intractable fatigue, abdominal pain/cramps, nausea, flatulence, incontinence, diarrhea, and vomiting as symptoms that rendered him unable to work. (AR0796). Plaintiff reported that he was restricted to a maximum of six hours a day of daily activity. (AR0796). In support of his claim, Sewell had his treating physicians submit reports to Lincoln in March 2008, which included their opinions on his symptoms and restrictions in mobility and activity. (*See* Rule 56.1 Stmt ¶ 36; AR0798 (Report of Marcus Porcelli, MD); Rule 56.1 Stmt ¶ 36; AR0784-85 (Attending Physician's Statement of Purnima Vallabhaneni, MD); Rule 56.1 Stmt ¶ 44; AR0778 (Attending Physician's Statement of Charles Franco, MD)).

D.  Plaintiff's Job and Duties

In response to Lincoln's investigation of Plaintiff's claim, Lehr advised Lincoln that Plaintiff's position of Project Executive, as performed for Lehr, had the following duties:

☐  For an incoming RFP, the Project Executive is responsible for attend all work thrus [sic], and meetings, including the Interview; preparing a detailed Schedule of Events; reviewing the Construction Schedule and all estimating budgets/proposals; in general, help coordinate all in-house efforts to win the Project.

☐  After the Project has been awarded to Lehr Construction –
-  The Project Executive is responsible for attending all trips to Subcontractor sites for the review of materials to be used on the Project.
-  Coordinate all internal efforts during the Project – Estimating, Cost Control, Billing and Construction.
-  Help coordinate all external efforts during the project with the Client, Client Representative, Architect, Engineer, Landlord, etc.

(Rule 56.1 Stmt ¶ 27; AR0813).

On April 15, 2008, Lincoln vocational specialist Deborah Frazee, MS ED, CRC reviewed

the information provided to Lincoln by Lehr of the main duties of Plaintiff's occupation and used

the Dictionary of Occupational Titles ("DOT") as published by the U.S. Department of Labor, to

determine what occupation best matched the main duties of Plaintiff's position as it was

performed in the national workforce.  Frazee concluded that Plaintiff's position was most

comparable to the DOT position of "Contractor,"[4] which is a light duty position.[5] (AR0036).

E.  Ongoing Monitoring of Sewell's Progress

On April 10, 2008, Lincoln approved Plaintiff's claim for long-term benefits.  (AR675-

77).  After approving Plaintiff's claim, Lincoln continued to monitor his progress over the next

18 months.

On May 1, 2008, Lincoln employee Joyce Mumm, RN, BSN, MSHP conducted a review

of Plaintiff's medical records. (AR0647-49).  After a review of the available medical evidence,

---

[4] The DOT description for "Contractor" states:

"Contracts to perform specific construction work in accordance with architect's plans, blueprints, codes, and other specifications; Estimates costs of materials, labor and use of equipment to fulfill provisions of contract and prepares bids. Confers with clients to negotiate terms of contract. Subcontracts specialized craft work, such as electrical, structural steel, concrete, and plumbing. Purchases material for construction. Supervises workers directly or through subordinate supervisors. May be designated according to specialty license or scope of principal activities as Contractor, General Engineering (construction; Contractor, General Buildings (Construction)." Rule 56.1 Stmt ¶ 48; AR0450.

[5] The DOT Occupational Requirements for "Contractor" designate the occupation as a light duty occupation, summarizing its requirements as "Lifting, Carrying, Pulling 20 lbs. occasionally, frequently up to 10 lbs., or negligible amount constantly. Can include walking and or standing frequently even though weight is negligible. Can include pushing and or pulling of arm and/or leg controls." (Rule 56.1 Stmt ¶ 49; AR0451); *see also* Oathout letter, at AR0179 ("The definition of light work is lifting no more than 20 lbs. on an occasional basis and up to 10 lbs. on a frequent basis, typically requires standing and walking for 6 hours out of an 8-hour day").

including review of Dr. Porcelli, Franco and Vallabhaneni's reports, Nurse Mumm concluded that the medical evidence supported restrictions and limitations for a light level work capacity through the surgery/recovery period, but not beyond usual and customary guidelines. (AR0647-49).

On November 5, 2008, Lincoln employee M. Miller, RN conducted a review of the claim. (AR0026-28). Her report included findings that Sewell had seen fewer episodes of abdominal cramping and found it "of note" that Sewell enjoyed playing golf despite his cramps. Miller reported that the medical records did not indicate loss of energy because of his surgery and thus concluded that "medical documentation no longer appears to support [restrictions and limitations] from [Sewell's] own light occupation." (Rule 56.1 Stmt ¶ 76; AR0028). On November 10, Lincoln notified Sewell that it had referred his medical records for an independent peer review.

On December 3, 2008, Alan Altman, MD, MS, FACP, who is Board certified in Gastroenterology and Internal Medicine, conducted an independent peer review and reported his findings and expert opinion as to Plaintiff's medical condition and ability to perform the duties of his light duty occupation (Rule 56.1 Stmt ¶ 78; AR0468-73). The Altman report was based on review of Plaintiff's medical history (including review of all related medical records) and consultation with Sewell's doctor, Dr. Vallabhaneni. At time of the consultation, Vallabhaneni believed that Sewell's symptoms were so severe and frequent to prevent the claimant from being able to satisfy the requirements of any job but agreed that re-evaluation in six months would be necessary to "evaluate possible improvement in his functional capacity that would allow a return to work in some capacity." (AR0468-71).

10

Based on this medical evidence and consultation, Dr. Altman concluded that Plaintiff had restrictions and limitations from a light duty occupation. The Altman report concluded also that Plaintiff's prognosis was not clear, but and that he might be able to return to work in some capacity. (AR0472). In light of the Altman report, Lincoln paid disability benefits to Plaintiff through early 2010, and continued to monitor his medical condition and ability to return to work. (AR0001).

On June 15, 2009, Lincoln wrote to Dr. Kastuar, Dr. Porcelli, Dr. Franco and Dr. Vallabhaneni to request updated medical records for a six-month follow-up. (Rule 56.1 Stmt ¶ 85; AR0393, 0398, 0406, 0409). On July 15, 2009, Lincoln employee Ted Hartsock, RN, BSN reviewed the medical records supplied by Plaintiff's doctors and concluded that Sewell continued to have restrictions and limitations from his own light work level and recommended revaluation in four to six months. (AR0024-25). As a result of this review, Lincoln concluded that Plaintiff remained eligible for disability benefits and continued to pay them to him. (*Id.*) 25.

On January 12, 2010, Lincoln requested Dr. Kastuar and Dr. Vallabhaneni to provide updated records to document Plaintiff's current medical condition. (AR0294, 307, 332). These reports were incorporated in the February 12, 2010 claim file note submitted by Lincoln Disability Claim Specialist Travis Pinkelman.

In the claim note, Pinkelman described Sewell as having "an [extended Own Occupation] and his [Maximum Benefits Period] isn't until 9/16/17." (Rule 56.1 Stmt ¶ 90; AR0004). Pinkelman recounted the previous medical history and symptoms and concluded that records continued to support conclusion that Sewell had restrictions and limitations from his own work light level from 09/24/08. Pinkelman arguably closes the entry with a question: "DOES THE MEDS SUPPORT BEING [TOTALLY DISABLED OWN OCCUPATION] NOW AND INTO

11

THE FORESEEABLE FUTURE B/C HE HAS AN [EXTENDED OWN OCCUPATION][?]"
(*Id.*)

    F.  Initial Appeal

On February 19, 2010, Lincoln employee Nurse Neary reviewed Sewell's claim file.
Neary noted a report of vomiting and hand and shoulder pain, and then noted Sewell's
improvements: the ability to play golf, stable weight and symptoms not so severe as to require
hospitalization, surgery or prescribing additional narcotics.  Neary concluded that "THE FILE
DOES NOT APPEAR TO SUPPORT [RESTRICTIONS AND LIMITATIONS] PRECLUDING
WORK CAPACITY."

Following Nurse Neary's report, on March 29, 2010, Lincoln again requested Altman to
review Sewell's records as an independent peer review.  Altman reviewed 350 pages of medical
documentation from Sewell's claim file.  On balance, Dr. Altman opined that, based on
improvements of Sewell's symptoms and stabilized weight since his December 2008 review,
Sewell now "retained the functional capacity necessary to perform a light duty physical demand
occupation on a sustainable full-time basis with certain restrictions and limitations."  (AR0289).

Altman listed restrictions and limitations including:  "intermittent cramping pain and
somewhat erratic bowel function" requiring "ready bathroom access and the ability to close his
workstation"; some element of fatigue for which Sewell should have a 15 minute rest period in
the morning and afternoon, access to drinking water which he could bring from home;
restrictions on driving a vehicle or operating heavy machinery and working from unprotected
heights when he required a narcotic like Vicodin; and accommodation for brief absences because
of symptoms. (Rule 56.1 Stmt ¶¶ 126-133; AR0289).

On April 15, 2010, Lincoln employee Deborah Frazee reviewed the Lincoln's claim file and Dr. Altman's second report.  Frazee concluded that Sewell could perform his own light occupation and at least some of the stated restrictions and limitations could be accounted for. Her conclusion was based on the fact that "he ha[d] the ability to manage physical condition for at least four hours at a time when on the golf course," an activity which "would include walking/moving, lifting, twisting, use of both upper extremities." (Rule 56.1 Stmt ¶ 135; AR0036).  Furthermore, he would always have access to a bathroom because "all employers [own, contracts, etc.] would be compliant with EEOC requirements for restrooms on site" and would not have to worry about closing his office because "no occupation requires a closing office for pain and private issues except a medical professional." *Id.*

On April 20, 2010, Mr. Pinkelman wrote to Plaintiff to advise that Lincoln had determined that he was no longer eligible to receive long-term disability benefits beyond payment through May 3, 2010. (AR0278-82).  On April 27, 2010, Sewell, by counsel, notified Lincoln that he was exercising his right of appeal and requested a copy of the administrative record. AR0277.  Sewell also submitted additional information for Lincoln's consideration.

G.  First Appeal: Brenda Oathout

On July 13, 2010, Lincoln Disability Appeals Specialist Brenda H. Oathout acknowledged receipt of the additional information that Plaintiff had provided and advised that Lincoln would need an additional 45 days in which to decide his appeal. (Rule 56.1 Stmt ¶ 162; AR0189).  Oathout also obtained an independent review of the medical evidence by Medsecure Medical Case Manager Angela Opfer, RN and Medsecure Nursing Supervisor Robin Welch-Shaver, RN, BSN, CCM, CLCP.  (Rule 56.1 Stmt ¶ 163).  In preparation of their July 19, 2010 report, Nurses Opfer and Welch-Shaver reviewed the medical records of Plaintiff's doctors, but

13

concluded that "[Restrictions and Limitations] are not supported for preclusion of a light or sedentary occupation from 5-4-10 forward." (Rule 56.1 Stmt ¶¶ 164-65).[6]

On July 28, 2010, Oathout wrote to Plaintiff's counsel to advise that Lincoln had affirmed its initial decision that Plaintiff was not currently Totally Disabled from the main duties of his occupation and was therefore not eligible for Lehr plan benefits after May 2, 2010. (AR0178).

The Oathout letter advised Plaintiff of his right to seek a second-level appeal from the decision that he was no longer eligible to receive disability benefits. AR0181. On October 14, Plaintiff took a second level appeal from Lincoln's decision that he no longer met the definition of Totally Disabled under the Policy. (Rule 56.1 Stmt ¶ 185; AR0151-57).

H.  Second Appeal

On October 22, 2010, Lincoln Disability Appeals Specialist Theresa Henderson wrote to Plaintiff's counsel to acknowledge Plaintiff's second-level appeal. (AR0149-50).  On November 23, 2010, Ms. Henderson advised that Lincoln would consult with an medical consultant with regard to Plaintiff's claim. (Rule 56.1 Stmt ¶ 187; AR0146).

On November 23, 2010, Stephen P. Schindler, MD, who is Board-certified in Internal Medicine and Gastroenterology, a member of the American College of Gastroenterology and the American Gastroenterology Association and licensed to practice medicine in Kentucky and South Carolina, provided his report to Lincoln of his independent evaluation of Plaintiff's medical records. (Rule 56.1 Stmt ¶ 188; AR0138-145).

---

[6] The Opfer/Welch-Shaver report, as available on ECF, does not actually contain this conclusion or the medical basis for it. *See* Dkt. No. 21-14, AR0183-85.

14

Dr. Schindler reviewed in detail the restrictions and limitations described by Plaintiff's attending physicians. (AR0139-40). In particular, he noted Dr. Vallabhaneni's opinion dated April 30, 2010 that Plaintiff continued to have severe abdominal pain, diarrhea and vomiting suggesting of adhesive disease and partial bowel obstruction, that his attacks were every two weeks and lasted three or four days, that he was taking multiple medications including Vicodin and maintained his weight by eating small meals throughout the day. Dr. Schindler further noted that Dr. Vallabhaneni and Dr. Franco, plaintiff's treating physicians were of the opinion that Plaintiff could not return to work and had limited mobility over extended periods. (Rule 56.1 Stmt ¶¶ 192-208; AR0139). Ultimately, Schindler discounted these conclusions as not reasonable and consistent with the medical findings. (AR0145).

On balance, Dr. Schindler concluded that "the claimant does not have functional impairment of the magnitude that would prevent him from performing a light level physical demand occupation," then proceeded to note certain restrictions and limitations: need for frequent and readily available access to bathroom facilities both in the office and on the job site; 15-20 minute rest periods in the morning and afternoon for fatigue; allowance to provide himself with frequent small meals; restriction from driving a vehicle or operating heavy machinery or working from any height; no lifting greater than 10 pounds on a regular basis or 20 pounds on an occasional basis. (Rule 56.1 Stmt ¶ 205; AR0144).

On February 1, 2011, after Plaintiff's doctors indicated they would not to provide a specific response to Dr. Schindler's report and would stand on their previously supplied medical opinions (Rule 56.1 Stmt ¶ 212; AR0130), Ms. Henderson wrote to Sewell's counsel that Lincoln had affirmed its initial claim decision and that Plaintiff's appeal had been denied for the second time, concluding his administrative appeals. (AR0123-128).

15

With this background in mind, we turn to the merits of the case.

DISCUSSION

I.   Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no issue of material fact where the facts are irrelevant to the disposition of the matter.  Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 900 (S.D.N.Y. 1988). To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On cross-motions for summary judgment, the court must consider each motion independently of the other and when evaluating each, the court must consider the facts in the light most favorable to the non-moving party. *Sciascia v. Rochdale Village, Inc.*, 851 F. Supp. 2d 460 (E.D.N.Y. 2012) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993); *Zaccaro v. Shah*, 746 F. Supp. 2d 508 (S.D.N.Y. 2010). *See also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir. 1987) ("In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant.")

II.    Arbitrary and Capricious Standard for ERISA Cases

When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, a district court must review deferentially a denial of benefits challenged under § 502(a)(1)(B). *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948,

16

956-57, 103 L.Ed.2d 80 (1989). The court may reverse only if the fiduciary's decision was arbitrary and capricious, that is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 646 (2d Cir. 2002); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995). Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] ... requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotation marks omitted, alteration in the original). Additionally, a decision must be "based on a consideration of the relevant factors." *Id.* (internal quotation marks omitted).

The parties do not dispute that Lincoln retained discretionary authority over determination of an employee's eligibility for benefits and over interpretation of the terms and provisions of the policy. However, Sewell argues that Lincoln has a "structural conflict of interest" that was manifest in Lincoln's decision to deny his claims for long-term benefits.

A structural conflict of interest occurs where an administrator both evaluates and pays benefits claims. While courts must take such a conflict into account and weigh as a factor in determining whether there was an abuse of discretion, it does not make *de novo* review appropriate. *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2348 (2008). This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation. *Id.*

The Supreme Court instructs that conflict of interest is just one of many factors under consideration and accordingly "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . and

17

should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy. . ." *Glenn,* 554 U.S. at 117, 128 S.Ct. at 2348.

Where a structural conflict of interest is alleged, the analysis "proceeds in two steps." *Durakovic v. Building Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir. 2010). "The initial inquiry is simple: whether the 'plan administrator both evaluates claims for benefits and pays benefits claims.'" *Id.* Here, both parties acknowledge that Lincoln was responsible for payment of disability benefits and claim review, creating a structural conflict of interest. The second step is to "determine how heavily to weight the conflict of interest thus identified." *Durakovic,* 609 F.3d at 138.

There is no dispute that thus the first step of a structural conflict of interest is present: Lincoln evaluates claims and subsequently pays or denies benefit claims under the Policy. Finding an arguable conflict, we continue to the second step.

Here, Lincoln has presented evidence that it has "taken active steps to reduce potential bias and to promote accuracy," as endorsed by the Supreme Court in *Glenn,* for instance, walling off its claims administrators from its finance department and ensuring that the compensation of claims or appeals specialists is not tied to denial of benefits claims. (*See* Dkt. Nos. 21-31 and 21-32, Decls. of Chris Gillogly; Travis Pinkelman, Brenda Oathout, Theresa Henderson). In addition, Lincoln submitted the medical records for independent peer review and assigned different internal claim specialists at each stage of review. *See Siegel v. Hartford Life Ins. Co.*, 2012 WL 2394879 (E.D.N.Y. June 25, 2012) (discussing measures taken to avoid conflict of interest, including "assign[ment] of multiple individuals to make and then review the initial

decision to deny Siegel's claim, and assign[ment of] separate individuals to process her appeal, all of which promotes accuracy of the administrator's review process) (citation omitted).

However, Sewell's primary critique is about purported signaling in Pinkelman's claim file entry that Sewell was a claimant with an extended own occupation period and thus, a potentially big payout. Indeed, every internal review of Sewell's claim after that notation resulted in denial. This observation does give rise to a question of whether the conflict of interest should be deemed "more important."

While I will still apply the arbitrary and capricious standard, I will certainly take account of a possibly unresolved conflict of interest in the claims review process as evidence of abuse of discretion. *Glenn*, 554 U.S. at 117; *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008) ("[A] plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate.").

Under the arbitrary and capricious standard, "[w]here both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control." *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Ben. Plan*, 698 F.2d 593, 601 (2d Cir. 1983). However, "deferential review is not no review, and deference need not be abject." *Zurndorfer v. Unum Life Ins. Co. of America*, 543 F. Supp. 2d 242, 258 (S.D.N.Y. 2008) (citing *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (internal quotations omitted)). "Where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation

19

render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *Pepe v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 559 F.3d 140, 147 (2d Cir. 2009); *O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 112 (2d Cir. 1995).

III.   Analysis

Defendant seeks summary judgment on the ground that they conducted a fair and full review of Sewell's claim (Dkt. 22, Mot. 18-19) and their claim determination was reasonable based on the information available to them (*Id.* at 19-25). Plaintiff argues, however, that Defendant's decision to discontinue Plaintiff's benefits was arbitrary and capricious because it ignored credible evidence, was based on the erroneous information it considered in its initial decision and its subsequent two appeals and evinced a conflict of interest.

A. Fair and Full Review

ERISA requires every benefit plan to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. "The purpose of the full and fair review requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." *Smith v. Champion Intern. Corp.*, 573 F. Supp. 2d 599, 615 (D. Conn. 2008) (quoting *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000)). "At the very least, a full and fair review requires that the fiduciary inform the participant or beneficiary of the evidence that the fiduciary relied upon and provide an opportunity to submit written comments or rebuttal documents." *Champion Intern. Corp.*, 573 F. Supp. 2d at 615 (quoting *Lidoshore v. Health Fund 917*, 994 F. Supp. 229, 236-37 (S.D.N.Y. 1998)).

There was a full review of the claim in that Lincoln provided Sewell with the administrative record and opportunities to submit comments and rebuttal documents. It is also true that a claim administrator need not give credence to every finding. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Furthermore, the use of the DOT is not arbitrary and capricious in and of itself. *See Thomas v. The Hartford Life Ins. Co. of America*, No. 11 Civ. 1490, 2013 WL 53710, *2 (S.D.N.Y. Jan. 2, 2013) (reasonable for insurer to interpret plan as permitting it to refer to the DOT in its evaluation of Thomas' occupation in the "general workplace," because the DOT is a common tool utilized by insurers for that purpose); *Champion Intern. Corp.*, 573 F. Supp. 2d at 619. Neither was Lincoln's selection and application of the "Contractor" description arbitrary and capricious. While Plaintiff refutes the applicability of the Contractor label, the available description of his regular occupation as project executive involved similar interactions with clients on job sites. Furthermore, Plaintiff's unwillingness to propose an alternate description until after the administrative review was over and this Court proceeding well under way is too little, too late. However, the Pinkelman notation may be enough to rebut the presumption of fair and full review if it created a conflict that actually affected the administrator's decision. *See Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009).

B.  The Claims Decision Was Arbitrary and Capricious

Besides the Pinkelman notation, there are grounds to find that the claim decision was not reasonable. It was the prerogative of Lincoln to continue monitoring Sewell's progress to make sure his condition warranted payment of disability benefits. Lincoln notes its reliance on the reports of independent peer-review doctors as well as the lack of requirement to heed contrary

21

opinions of Sewell's treating physicians.  While all of these points are true, Lincoln must base its

decision "on a consideration of the relevant factors." *Miller*, 72 F.3d at 1072.

> 1.   The Claims Decision Was Based on Speculative Assumptions About
>       Plaintiff's Condition

Although the burden lies on the claimant to provide proof of disability, speculation or

assumption on the part of the administrator is insufficient to overcome a conflicting medical

opinion. *See Miller*, 72 F.3d at 1073; *Catania v. NYSA–ILA Severance Benefit Fund,* No. 91 Civ.

3262, 1992 WL 176502, at *7-9 (S.D.N.Y. July 15, 1992) (defendants' denial of benefits based

on speculative analogies, in the face of contrary medical opinion, was arbitrary and capricious).

Frazee made such speculative analogies in her report that Sewell would not need to closed his

office for illness (ostensibly a misplaced concern about lost revenue) and that Sewell could stand

and move his arms for four hours based solely on an entry that plaintiff plays golf was highly

speculative, especially in light of the fact that Sewell was still very symptomatic.  (*See* Rule 56.1

Stmt ¶ 135; AR0036).  Furthermore, there is little substance to the Opfer/Welch-Shaver report on

which Lincoln based its denial of plaintiff's first appeal. (*See* Rule 56.1 Stmt ¶ 163).

> 2.   The Claims Decision Failed to Consider Sewell's Own Occupation[7]

Plaintiff also argues that Lincoln's denial was arbitrary and capricious because failed to

use the "own occupation standard" and failed to recognize that the restrictions and limitations

caused by Sewell's illness could not be accommodated in his own occupation.

Regarding regular occupation, the Second Circuit requires consideration of "a position of

the same general character as the insured's previous job, requiring similar skills and training, and

---

[7] As in the Policy, "own occupation" is interchangeable with "regular occupation" throughout
this Opinion.

involving comparable duties.'" *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243,

252 (2d Cir. 1999) (quoting *Dawes v. First Unum Life Ins. Co.,* 851 F. Supp. 118, 122 (S.D.N.Y.

1994)) (internal quotation marks omitted). While "'regular occupation' is not to be defined so

narrowly as to include only the characteristics of [a claimant's] job, it must be defined as a

position of the "same general character" as [a claimant's] job." *Kinstler*, 181 F.3d at 252.[8]

Thus, Sewell's disability is based on his inability to perform his "own occupation," and

must not be evaluated on an "any occupation" standard. Yet this is precisely what Lincoln did

when it had the peer-review doctors, Altman and Schindler, review the claim based solely on the

characterization that Sewell's occupation as light-duty work. Schindler's report, for instance,

characterizes Sewell as "a 59-year-old male contractor (Project Director). . . [whose] provided

job description states that this is a light level job." (AR0138). All of his subsequent conclusions

and caveats are based on the idea of Sewell performing a "light level occupation." By its nature,

"light-level" classification is even more general than a DOT nationwide job group classification

and, in and of itself, less reflective of Sewell's own occupation and the main duties thereof.

Thus, failure to consider Sewell's regular occupation beyond the labels of "light-level work" was

arbitrary and capricious.

3.  The Claims Decision Did Not Consider the Feasibility of Stated Restrictions
    and Limitations in Light of Plaintiff's Own Occupation

---

[8] Although *Kinstler* reviewed under a *de novo* standard, its principle is applied in cases reviewed
on an arbitrary and capricious standard. *See, e.g.*, *Shore v. Painewebber Long Term Disability
Plan*, No. 04-CV-4152 (KMK), 2012 WL 3047113, at *12 (S.D.N.Y. Oct. 15, 2007) (analyzing
under arbitrary and capricious standard because of administrator-retained discretionary
authority); *Peterson v. Continental Cas. Co.*, 77 F.Supp.2d 420, 427-429 (S.D.N.Y. 1999)
(applying *Kinstler* and finding administrator was arbitrary and capricious for considering a
temporary position that was much more sedentary than plaintiff's regular occupation).

Even if it is implausible to expect the peer-review doctors to so closely scrutinize the main duties of Sewell's regular occupation, Lincoln was required to do so. Lincoln, in reviewing the doctors' reports, did not take into account the plausibility of the proffered restrictions and limitations being accommodated in any setting where Sewell would perform his own occupation. Here, Drs. Altman and Schindler, on review of the medical evidence, submitted a report without consideration of whether the suggested accommodations would be possible. (*See* AR0283-291; AR0138-0145). Then Lincoln relied on those reports without determining feasibility of the accommodations. Other courts have found it arbitrary and capricious not to consider whether the stated restrictions and limitations can be accommodated. *E.g.*, *Frei v. Hartford Life Ins. Co.*, No. C-05-01191 EDL, 2006 WL 563051, at *8-9 (N.D. Cal. Mar. 7, 2006) (finding insurer makes an unsupported assumption that there is no evidence as to whether Plaintiff's past employer, or any other employer, would permit sufficient modifications to accommodate her restrictions); *Rouse v. UNUM Life Ins. Co. of America*, No. Civ. 04-1090(JNE/RLE), 2005 WL 2000181, at *8 (D. Minn. Aug. 18, 2005) (finding abuse of discretion for denial of benefits where both claimant's and insurance company's doctors counseled restrictions and limitations on heavy lifting, which would prevent claimant from performing at least one of the material duties of his job); *see also Zurndorfer*, 543 F. Supp. 2d at 262-263 (chiding insurer for a conclusion that "bespeaks advocacy, not a reasonable review of the administrative record" where claimant's mobility limitations "under any scenario, and certainly in any urban location . . . would be material requirements of [claimant's] occupation").

Here, Schindler's report urged these restrictions and limitations as necessary to his finding that claimant did not have a functional impairments to return to full-time employment. AR0145 ("[T]he claimant does not have any physical or function impairment from a

24

gastrointestinal standpoint that would have prevented the performance of the essential tasks and duties of his own light level occupation *as long as the restrictions and limitations. . .are met.*") (emphasis added). However, there is no evidence that Dr. Schindler or anyone at Lincoln considered whether those restrictions and limitations would be met in the real world. *See Frei*, 2006 WL 563051, at *10.

For these reasons, the claims decision that Sewell was not totally disabled despite required restrictions and limitations was arbitrary and capricious. Accordingly, Lincoln's motion for summary judgment is denied.

IV.    Remand

Although Lincoln's decision was arbitrary and capricious, a court should remand a case for determination of claimant's eligibility for benefits unless remand would be a "useless formality" because the plan administrator "would necessarily have to grant the claim...." *See Miller*, 72 F.3d at 1071 (citation omitted).

Lincoln did not have an opportunity to consider the evidence that Plaintiff now brings before the Court. (*See* Dkt. No. 39, Def. Reply, at 6-8). "Where the administrative record does not contain evidence that the court finds should have been considered, the proper result is remand to the Claim Administrator." *Peterson*, 77 F. Supp. 2d at 429 (citing *Maida v. Life Ins. Co. of North America*, 949 F. Supp. 1087, 1093 (S.D.N.Y. 1997) (noting that judicial efficiency and the intent of ERISA support remand pending final disposition). Rather than allow Plaintiff to play tactical games with the Court, it is most prudent to remand this case and allow it to be resolved directly with the fiduciary. It cannot be said as a matter of law that the denial was erroneous. Thus, Sewell's cross-motion for summary judgment is also denied.

The difficulty here is that the administrative record was incomplete and Lincoln did not thoroughly consider whether the extent of restrictions and limitations render Sewell totally disabled. Thus, on remand, Lincoln should determine whether Plaintiff can perform each of the main duties of his own occupation in view of his restrictions and limitations and the feasibility of accommodation. Sewell is to submit to Lincoln any further evidence not already on the administrative record within 20 days of this Order. Lincoln is to reconsider and render its decision within 30 days of receipt of any evidence proffered by Plaintiff. The Parties are directed to report the status of the remand 60 days and 120 days after the date of this Opinion and Order. *See Shore*, 2007 WL 3047113, at *15 (adopting similar procedure).

## CONCLUSION

The Defendants' Motion for Summary Judgment (Dkt. No. 21) is DENIED. Sewell's Cross-Motion for Summary Judgment (Dkt. No. 32) is also DENIED. On remand, the Parties are ordered to proceed in the manner set forth herein.


SO ORDERED.

Dated:     March 22, 2013
           New York, New York

_____
United States District Judge